UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------x

UNITED STATES OF AMERICA                       :

   - v. -                                                    :          24 Cr. 537 (LJL)

BRIAN CORDASCO,                                    :

                 Defendant.              :

-------------------------------------------------------------x

**THE GOVERNMENT'S CORRECTED SENTENCING SUBMISSION**

                                           MATTHEW PODOLSKY
                                           Acting United States Attorney for the
                                           Southern District of New York
                                           Attorney for the United States of America

Jessica Greenwood
Matthew King
Daniel H. Wolf
Assistant United States Attorneys
Of Counsel

## <u>Table of Contents</u>

I.     The Offense Conduct ........................................................................................................... 1

II.    The United States Sentencing Guidelines ......................................................................... 5

III.   The 18 U.S.C. § 3553(a) Factors ...................................................................................... 6

   A.   The Nature, Circumstances, and Seriousness of the Offense ............................................ 7

   B.   The Need to Promote Respect for the Law and to Provide Just Punishment ..................... 9

   C.   The Need to Afford Adequate Deterrence to Criminal Conduct ...................................... 11

   D.   The Guidelines Recommendation .................................................................................... 12

   E.   The History and Characteristics of the Defendant ........................................................... 13

   F.   The Need to Avoid Unwarranted Sentencing Disparities ................................................ 17

IV.    The 18 U.S.C. § 3572(a) Factors .................................................................................... 18

V.     Conclusion ...................................................................................................................... 19

The Government respectfully submits this corrected memorandum in advance of the sentencing of defendant Brian Cordasco ("Cordasco" or the "defendant"). As set forth below, because Cordasco repeatedly abused his position of public trust as a high-ranking official in the New York City Fire Department ("FDNY"), this Court should impose a significant sentence of between 42 to 48 months' imprisonment and a statutory maximum fine of $250,000.

## I.    The Offense Conduct

For several years, Cordasco betrayed the public trust by providing preferential treatment to commercial entities with business before the FDNY Bureau of Fire Prevention ("BFP") in exchange for lucrative bribe payments. The BFP provides oversight of the installation and maintenance of fire safety and suppression systems in commercial and residential buildings throughout the City. (January 6, 2025 Final Presentence Investigation Report ("PSR") ¶ 18.) That oversight includes responsibility for reviewing plans submitted by commercial entities for the installation of fire safety and suppression systems, as well as inspections of those same systems once they are installed. (*Id.*) In many cases, BFP approvals of plan reviews and BFP inspections are required before a building can be occupied or opened to the public. (*Id.*) But in virtually all cases, by policy, the BFP engages in plan reviews and inspections on a first-come-first-serve basis. (*Id.*)

Beginning in or about the summer of 2021, Cordasco, who by then was a 19-year veteran and high-ranking member of the FDNY, joined a conspiracy that undermined the BFP's first-come, first-served system for plans reviews and inspections by adopting a secret and corrupt pay-to-play model. Members of the conspiracy included Cordasco's supervisor, Anthony Saccavino, who at all relevant times was either Deputy Assistant Chief or, later on, the Chief of the BFP, and Henry Santiago Jr., a former FDNY employee who acted as an unofficial "expediter" for commercial entities seeking approvals before the BFP. (*Id*. ¶¶ 15-16, 28.) As part of the conspiracy, Santiago

paid Saccavino and Cordasco in exchange for Santiago's clients obtaining preferential treatment from the BFP. Access to fast-tracked plan reviews and inspections by the BFP was particularly valuable at the time, when COVID-related staffing shortages and backlogs meant that the general public had to wait many weeks or months to get their BFP applications resolved. (*Id.* ¶¶ 21, 22.)

The power and influence that Saccavino and Cordasco exercised within the BFP were critical to the conspiracy's success. In exchange for payments from Santiago, Saccavino and Cordasco used their positions and access to information to insist that subordinates expedite matters on behalf of Santiago's clients, to ask for status updates on those matters, and, where needed, to reallocate BFP personnel and resources to ensure that Santiago's paying clients were in fact receiving preferential treatment from the BFP. (*See id.* ¶ 34.) Indeed, Saccavino and Cordasco used their authority as BFP Chiefs to reorganize the BFP to consolidate the responsibility for plan reviews and inspections into a single unit, in part to make it easier to expedite both plan reviews and inspections on behalf of bribe-paying customers of Santiago's company. (*See id.* ¶ 25.) To advance this goal even further, Saccavino and Cordasco placed a trusted (albeit unwitting) BFP employee at the head of this newly consolidated unit, and repeatedly directed him to expedite plan reviews and inspections for Santiago's clients and in exchange for payments to Saccavino and Cordasco from Santiago. (*Id.*)

The bribery conspiracy concluded in early 2023—more than a year before the investigation that led to Cordasco's arrest became overt—but not because its members had a change in heart. To the contrary, the conspiracy appears to have concluded solely because of internal strife among its members. (*Id.* ¶ 34.) In particular, Santiago—the bribe payor—came to distrust Saccavino and Cordasco, and the Government has every reason to believe that the conspiracy would have continued but for that distrust.

The conspiracy involved various forms of deceptions and lies by Cordasco. Among other things, while secretly accepting tens of thousands of dollars in bribe payments to expedite BFP inspections and plan reviews, Cordasco publicly and privately criticized efforts by City Hall to direct the BFP to give preferential treatment to select projects—noting, for example, that such preferential treatment despite long backlogs was "extremely unfair" to the general public and "highlights the lack of staffing" within the BFP. (*Id.* ¶¶ 24, 26.) Through such comments, which were publicly reported in the media, Cordasco painted himself as a champion of the BFP's first-come, first-served policy. Meanwhile, Cordasco was repeatedly violating that same policy and personally profiting from his own efforts to compromise the integrity of the BFP process. (*Id.* ¶ 26.) Cordasco's hypocrisy lays bare a plain truth: Cordasco corrupted the first-come, first-served approach with full awareness that his actions were wrong, and knew that his actions undermined the public's confidence that government services were being administered fairly.

Saccavino and Cordasco also leveraged public knowledge of City Hall's advocacy to BFP to advance the conspiracy's goals. On several occasions, when Saccavino and Cordasco directed subordinates to expedite plan reviews and inspections for the benefit of Santiago's clients, Saccavino and Cordasco falsely told their BFP subordinates that those expediting requests had come from City Hall or other components of City government. In fact, these projects were fast-tracked because of the bribe payments funneled from Santiago to Cordasco and Saccavino. (*See, e.g.*, *id.* ¶¶ 40(a), (b).)

Cordasco made false and misleading statements to cover up his crimes at nearly every step. Near the start of the conspiracy, Cordasco did so in a mandatory financial disclosure form he filed with the City in 2022. (*Id.* ¶ 41.) Despite a requirement that he do so, Cordasco did not disclose on his disclosure form any outside employment or business with Santiago, Santiago's company,

or Saccavino. (*Id.* ¶ 42.) When asked about outside employment, Cordasco disclosed, in part, that he had "Non-City Employment" with an LLC that he had formed. (*Id.*) Cordasco described his position at the company as a "Consultant" and claimed that the company "[p]rovide[s] consulting services and logistics for events, trade shows and other large industry gatherings" without disclosing that the LLC's principal (if not exclusive) purpose was to receive bribe payments from Santiago. (*Id.*) Indeed, Cordasco falsely claimed on the form that the LLC **does not conflict with the duties and responsibilities I perform with the FDNY**." (*Id.*) (emphasis added).)

Several months after the conspiracy ended (and at a time when Cordasco had the benefit of several months of time and reflection for his wrongdoing), Cordasco continued the lies when given an opportunity to come clean. On February 29, 2024, federal agents executed a search warrant upon Cordasco's premises and person in connection with the investigation that led to his arrest. On that day, with federal agents having entered his home just before dawn and in full awareness of the gravity of his conduct, Cordasco agreed to participate in a voluntary interview with law enforcement. (*Id.* ¶ 44.) Yet, during that interview, Cordasco lied—and did so in multiple ways. (*Id.*) Most significantly, Cordasco falsely denied expediting or attempting to expedite BFP requests for Santiago, and he falsely denied receiving payments from Santiago in connection with Cordasco's role in the BFP. (*Id.*) Cordasco persisted in these false statements despite receiving repeated warnings from federal agents that it was a crime for him to lie to federal agents. (*Id.*)

Finally, in addition to their bribery scheme, the corrupt relationship between Cordasco, Saccavino, and Santiago also involved a separate conflict of interest in the form of a scheme to operate a side business that provided fire guards to commercial entities under the supervision of BFP. (*Id.* ¶¶ 35-38.) Fire guards are individuals certified by the BFP's Public Certification Unit

and employed by private businesses to stand watch for fires in buildings that lack operating fire protection systems, including during new construction, planned repairs, and unplanned outages. (*Id.* ¶ 35.)  As part of the fire guard scheme, Cordasco and Saccavino worked as fire guard supervisors under Santiago's company, and shared in the profits that Santiago's company earned hiring third parties as fire guards.  (*Id.* ¶ 36.)  Neither Cordasco nor Saccavino disclosed to the BFP or the City the conflict of interest inherent in this scheme—*i.e.*, that while serving as high-ranking members of the very same division of the FDNY that was responsible for certifying and regulating the use of fire guards in New York City, they were also being paid by Santiago's company to supervise fire guards and received a portion of the profits from Santiago's fire guard business.  (*Id.* ¶ 37.)

## II.    The United States Sentencing Guidelines

The recommended sentencing range under the United States Sentencing Guidelines ("U.S.S.G." or the "Guidelines") is set forth in the Presentence Report.  (*See* PSR ¶¶ 50-62, 91.) The calculations in the Presentence Report are the same as those in the plea agreement, and are not disputed by either party.  (*See* PSR ¶ 93; Def. Sentencing Br., Dkt. 45, at 4.)  Cordasco's offense level is calculated as follows:

Count One carries a base offense level of 14 because Cordasco accepted bribes as a public official.  (*Id.*¶ 51.)  Two levels are added because Cordasco's bribery scheme involved more than one bribe payment.  (*Id.* ¶ 52.)  Ten levels are added because the scheme involved bribes totaling $190,000.  (*Id.* ¶ 53.)  Four levels are added because Cordasco committed the bribery scheme while serving in a high-level decision-making role.  (*Id.* ¶ 54.)  Finally, two levels are added because Cordasco oversaw the BFP personnel whose expedited official actions were purchased pursuant to the bribery scheme, such that Cordasco was an organizer, leader, manager, or supervisor.  (*Id.*

¶ 56.)  After the removal of three levels for acceptance of responsibility, Cordasco's adjusted offense level is 29.  (*Id.* ¶¶ 60-62.)

Absent the statutory maximum term of imprisonment of 60 months for Count One, the Guidelines recommend a sentence of 87 to 108 months' imprisonment for Cordasco's criminal conduct.  (PSR ¶ 93.)  But because the Government agreed to allow Cordasco to plead guilty to a statute carrying a maximum sentence of 60 months as consideration for his timely guilty plea, the Guidelines recommend a sentence of 60 months' imprisonment (the "Stipulated Guidelines Sentence").  (*Id.* ¶ 91.)  The Guidelines also recommend a fine of between $30,000 and the statutory maximum fine of $250,000.  (*Id.* ¶¶ 97, 99.)

## III.    The 18 U.S.C. § 3553(a) Factors

After a lengthy career as a firefighter, Cordasco left the rank-and-file to join the FDNY division responsible for enforcing the City's fire safety regulations.  Together with his immediate supervisor and co-conspirator, Saccavino, Cordasco supervised the BFP personnel responsible for conducting plan reviews and inspections of fire safety and suppression systems in New York City. Within months of joining the BFP, Cordasco began taking advantage of his position to sell expedited access to City services.  Cordasco engaged in this conduct for a period spanning from 2021 through early 2023, and accepted bribes in connection with approximately 30 different projects across New York City.  He abused his power and influence within the BFP to effectuate this scheme, including by using unwitting BFP personnel as aids in his crime, and repeatedly told lies to further and conceal his criminal activity.  The sentencing factors in 18 U.S.C. § 3553(a) support a significant sentence of imprisonment as a result of this conduct.  Accordingly, the Government respectfully requests the Court impose a custodial sentence of not less than 42 months' imprisonment and not more than 48 months' imprisonment.

**A.     The Nature, Circumstances, and Seriousness of the Offense**

A significant sentence of between 42 and 48 months' imprisonment—reflecting a modest variance below the Stipulated Guidelines Sentence—and a $250,000 fine are necessary to reflect "the nature and circumstances of the offense," 18 U.S.C. § 3553(a)(1), and "the seriousness of the offense," 18 U.S.C. § 3553(a)(2)(A).

Cordasco repeatedly betrayed the trust placed in him by the FDNY and the public, all in order to enrich himself.  Courts in this District have consistently emphasized the harm that similar bribery and corruption offenses cause.  For example, Judge Caproni observed in sentencing a defendant in one of the New York City Housing Authority ("NYCHA") bribery cases that public corruption is "one of the most serious of all federal offenses" because "[t]his country cannot exist if the public does not trust that public officials are operating as servants of the people and not corruptly for their own personal gain."  *United States v. Rupnarain*, No. 24 Cr. 125 (VEC), Dkt. 28 at 25 (S.D.N.Y. Aug. 5, 2024).  Judge Cote, in sentencing a different NYCHA employee to 15 months' imprisonment for accepting approximately $6,000 in bribes, described the offense as "a real betrayal":

> You betrayed your employer, you betrayed the city, you betrayed the residents of the houses at which you worked. This was a corruption of your job and your duties. You were given responsibility and authority, and instead, you used that to get money you had no right to. And corruption is a corrosive, destructive issue. People need to have faith in their government. They need to have faith in their public housing that it's a community resource that can be used to support those in need.

*United States v. Figueroa*, No. 22 Cr. 605 (DLC), Dkt. 27 at 17 (S.D.N.Y. Feb. 9, 2023).

As another example, Judge Oetken observed in sentencing a different NYCHA defendant to five months' imprisonment for taking $9,500 in bribes that:

> Because the conduct was so widespread within NYCHA, one might look at it, although superficially, like it was sort of routine behavior and therefore almost innocuous, but it was not innocuous or innocent, and it's important that we all

> understand that. It's the kind of conduct that undermines faith in our government and in institutions that are supposed to help people. It is criminal conduct that is hard to detect. It's more subtle than some others forms of criminal conduct, but there are real victims; not just NYCHA but sort of the public's faith in the government. It creates cynicism, this sort of corruption.

*United States v. Escobar*, No. 24 Cr. 213 (JPO), Dkt. 23 at 25-26 (S.D.N.Y. July 25, 2024).

And similarly, in a recent bribery case involving corrupt Drug Enforcement Administration ("DEA") officials, Judge Oetken called bribery of public officials "insidious [because] it undermines the public's faith in our system . . . . There are a lot of countries around the world where this sort of corruption is routine, it's part of life, everyone expects it. One of the things that sets our country apart, at least in our aspirations and our ideals, is to be free of this sort of corruption." *United States v. Costanzo*, No. 22 Cr. 281 (JPO), Dkt. 253 at 54 (S.D.N.Y. Apr. 24, 2024).

Cordasco's offense is made even more serious by the fact that he was one of the highest-ranking officials in the FDNY—and one of the two most senior officials at the BFP—at the time he committed his crime. Because of his rank and position, Cordasco, more than most other members of the FDNY, was entrusted with significant power (and a considerable annual salary of $257,000) and expected to use his power, position, and the comfort that such a salary affords to act solely for the good of the public and the FDNY. Betraying the public's trust from so lofty a position, as Cordasco did here, is among the most serious of public corruption offenses and demands a substantial sentence of imprisonment to appropriately punish Cordasco's repeated betrayal of public trust for personal gain. *See United States v. Rupnarain*, 24 Cr. 125 (VEC), Dkt. 28 at 26 (S.D.N.Y. Aug. 5, 2024) ("I think society expects public corruption to be treated seriously and for corrupt officials to be punished.").

The relatively modest monetary gain that Cordasco personally achieved—$57,000 out of a total of $190,000 in bribe payments obtained and divided among the co-conspirators—should not create the misimpression that his crimes were small in scale. Likewise, the fact that the inspections and plan reviews that were expected as part of the scheme *in fact* occurred does not minimize the harm that Cordasco caused as a result of his conduct. (*See* Def. Sentencing Br. at 2.) The scheme in which Cordasco participated spanned from 2021 through early 2023; involved nearly $200,000 in bribe payments in connection with approximately 30 different projects across the City; and was committed using a combination of official power, influence, and lies. Standing alone, the offense conduct is far-ranging and serious.

Moreover, while it is true that the BFP actually performed the inspections and plan reviews that were expected as part of the scheme, it does not follow that the public was therefore unharmed by Cordasco's criminal conduct. To the contrary, the public trust in the integrity of the BFP process—a process that Cordasco hypocritically claimed to be a defender of at the time—was undoubtedly broken as a result of Cordasco's actions. By any definition, such conduct and its effect on the public are serious and demand a significant punishment.

### B.    The Need to Promote Respect for the Law and to Provide Just Punishment

Given the seriousness of Cordasco's conduct, a significant sentence of incarceration is also necessary "to promote respect for the law, and to provide just punishment for the offense." 18 U.S.C. § 3553(a)(2)(A). The American public—and, as most relevant here, the residents of New York City—deserve to know that state, local, and federal officials will be sanctioned for exploiting their power in service of self. *See, e.g.*, *United States v. Sampson*, 898 F.3d 287, 314 (2d Cir. 2018) (finding above-Guidelines sentence justified by district court's reasoning that "there has to

be a sense that we give to the public that we are going to safeguard the integrity of our system . . . . That we will hold our public officials to a higher standard . . . .").

Cordasco, however, asks to be sentenced to one year of home confinement and 1,000 hours of community service (Def. Sentencing Br. at 1, 11)—meaning he would serve no time in prison for his crimes. Such meager punishment would hardly comport with society's understanding of just punishment and would undermine respect for the law. Cordasco's contrary arguments have already been rejected by the Second Circuit. According to him, it is enough that his conviction forced him to leave the FDNY in disgrace, cost him his reputation, and embarrassed him before his family. But as the Court of Appeals has explained, that does not constitute just punishment because "[t]hose are consequences generally suffered by anyone accused and convicted of a crime," especially a serious one. *United States v. Cutler*, 520 F.3d 136, 170-71 (2d Cir. 2008) (holding district court erred as a matter of law in imposing nonincarceratory sentence on grounds that humiliation and loss of law license adequately punished convicted attorney).[1] To suggest that Cordasco can be adequately punished merely by loss of status is to reward him for the very privileges he abused. And following through with that logic would lead to an absurd and unjust result: only less fortunate defendants need to be jailed, because they have so much less to lose. *See id.* ("[T]he imposition of a nonincarceratory sentence on the basis that a defendant has suffered

---

[1] The Second Circuit later abrogated *Cutler* because its review of the district court's sentencing analysis was unduly searching. The Circuit has, however, continued to rely on *Cutler*'s substantive reasoning in explaining why privileged defendants like Cordasco do not deserve lenient treatment. *See Watts v. United States*, No. 21-2925, 2023 WL 2910634, at *3 & n.2 (2d Cir. Apr. 12, 2023) (citing *Cutler* and holding that sentencing court should not place undue emphasis on wealthy defendant's ability to pay restitution, to avoid creating unwarranted sentencing disparities with less well-off defendants).

sufficiently simply because he was prosecuted and convicted would create unwarranted disparities among similarly situated defendants.").

### C.      The Need to Afford Adequate Deterrence to Criminal Conduct

Deterring government officials—particularly those responsible for maintaining the integrity of the public's access to critical government services—from engaging in pay-to-play schemes also requires a significant term of imprisonment. *See* 18 U.S.C. § 3553(a)(2)(B). Crimes such as Cordasco's "are hard to detect and prosecute, and so the sentence imposed must be sufficient to deter conduct of this sort." *United States v. Burman*, No. 16 Cr. 190 (PGG), 2020 WL 3182766, at *5 (S.D.N.Y. June 13, 2020) (internal quotation marks omitted). *See also Rupnarain*, Dkt. 28 at 29 (noting that "these sorts of schemes are very hard to catch," and "because people know they're hard to catch, it's got to be that the punishment is sufficiently severe that people will say, I'm not going anywhere close to that because I know what happens to even good people"); *accord United States v. Zukerman*, 897 F.3d 423, 430 (2d Cir. 2018) (general deterrence considerations "argue for punishing more heavily those offenses that are either lucrative or are difficult to detect and punish, since both attributes go to increase the expected benefits of a crime and hence the punishment required to deter it"). Schemes like Cordasco's are also highly lucrative, and in this case generated about $190,000 in bribe payments before the co-conspirators had a falling out and ceased engaging in their activities. Preventing others from following in Cordasco's footsteps thus supports a significant sentence. *See United States v. Heffernan*, 43 F.3d 1144, 1149 (7th Cir. 1994) ("Considerations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expected benefits of a crime and hence the punishment required to deter it.").

In seeking a nonincarceratory sentence and a punishment requiring he conduct community service, Cordasco does not explain how his sentence will deter others in a position of responsibility from taking bribes.  It is clear that "[t]he need for general deterrence is particularly acute in the context of white-collar crime."  *United States v. Johnson*, No. 16 Cr. 457 (NGG), 2018 WL 1997975, at *5 (E.D.N.Y. Apr. 27, 2018).  Many other individuals—like Cordasco—hold similar positions of public trust, have the opportunity to commit similar offenses, and face similar temptations to betray their offices, and so a substantial term of imprisonment is needed to deter these individuals from making the same choices the defendant did.  *Cf. United States v. Emmenegger*, 329 F. Supp. 2d 416, 427 (S.D.N.Y. 2004) (discussing particular need to deter financial institution employees from breaching trust of employer by engaging in frauds).  Any sentence imposed in this case must send a message to those who seek to illegally profit from their FDNY positions—or other positions of trust in local, state, or federal government agencies—that such conduct will not be tolerated and that serious consequences, including incarceration, will result.

### D.    The Guidelines Recommendation

Cordasco does not address the Stipulated Guidelines Sentence other than to ask for an extraordinarily lenient sentence of no imprisonment.  The recommended Guidelines sentence is nevertheless among the factors this Court considers by statute.  *See* 18 U.S.C. § 3553(a)(4).  And although the Court cannot presume that a sentence within the Guidelines will always be reasonable, "[i]n the overwhelming majority of cases, a Guidelines sentence will fall comfortably within the broad range of sentences that would be reasonable in the particular circumstances."  *United States v. Bryant*, 976 F.3d 165, 181 (2d Cir. 2020).  Precedent thus commends the Guidelines "as a

'benchmark or a point of reference for departure.'" *United States v. Bershan*, 845 F. App'x 37, 41 (2d Cir. 2021) (quoting *United States v. Villafuerte*, 502 F.3d 204, 210 (2d Cir. 2007)).

None of the facts of this case warrant a significant variance from the Guidelines, much less a nonincarceratory sentence. Cordasco was a high-ranking official in the FDNY, ultimately rising to the level of the second-of-command in the BFP. He then turned to his public influence and trust to cheat and profit from the same New Yorkers he was entrusted to serve, and repeatedly used lies and deception to further and conceal those efforts. Such conduct should not be rewarded with the kind of extraordinary leniency that Cordasco seeks. However, considering the totality of the circumstances—including, as to Cordasco, his relative culpability to his BFP boss, Saccavino, and his almost immediate guilty plea—the Government believes that a slight downward variance of no more than 18 months would be warranted.

### E.    The History and Characteristics of the Defendant

The most important aspect of Cordasco's history and characteristics, 18 U.S.C. § 3553(a)(1), is that he was a high-ranking FDNY official who engaged in a sustained pattern of crime and misconduct in a bid to enrich himself at the expense of the public trust. Cordasco claims that his offense conduct amounts to an "aberration" inconsistent with his character, and that he still cannot comprehend why he engaged in the crime (Def. Sentencing Br. at 3)—but that claim is simply incompatible with his conduct. As discussed throughout, the charged conduct spanned a significant period of time, involved dozens of projects across the City, and was furthered and concealed by Cordasco through a series of lies and fraudulent omissions—including repeated false statements to FBI agents investigating his crimes. Cordasco's criminal conduct (and the related fire guard scheme that posed a clear conflict of interest with Cordasco's official duties) was planned, prolonged, and designed to reap significant profits for the three co-conspirators. In short,

13

from at least 2021 until 2023, Cordasco repeatedly abused a position of significant public trust and put his own greed above the law and the residents of New York City.

As another argument for mitigation, Cordasco points to his service as a uniformed FDNY firefighter in the period before he began committing crimes, including his role in 9/11 recovery efforts (Def. Sentencing Br. at 4-5), and his "courage and skill" as a firefighter (Def. Sentencing Br. at 5, 7-8). While the Government respects and appreciates Cordasco's service with the FDNY, and acknowledges that a defendant's past public service can, under certain circumstances, be a mitigating factor, it is not a significant mitigating factor here because Cordasco was able to commit the instant crime, which was so damaging to the public trust, precisely because of the senior position he held at the FDNY. In other words, it is perverse for Cordasco to seek leniency based on the same achievements that laid the foundation for his crimes. One should expect a senior leader in the FDNY who rose through the uniformed ranks (as opposed to civilian ranks) to have had been an exemplary firefighter, and so it is of limited import that Cordasco had competently performed the job which brought him to the position of privilege and power that he ultimately used to commit his crimes. *See United States v. Serafini*, 233 F.3d 758, 773 (3d Cir. 2000) (good works as a legislator "reflect[] merely the political duties ordinarily performed by public servants" and "if a public servant performs civic and charitable work as part of his daily functions, these should not be considered in his sentencing because we expect such work from our public servants"). As one court in this District explained when denying a white-collar defendant credit for his prior public service:

> It is precisely the defendant's mantle of integrity and benevolence that serves as cover for an invidious end, enabling him to move about his game undetected, the better to prey upon those who least expect it. In other words, it is the widespread recognition in the community that the defendant enjoys for strong character, integrity, sound values and good public deeds that facilitates his hidden life of crime. The two aspects go hand in hand.

14

*United States v. Fishman*, 631 F. Supp. 2d 399, 403 (S.D.N.Y. 2009); *see also United States v. Repking*, 467 F.3d 1091, 1096 (7th Cir. 2006) (denying bank president credit for charitable works where those "charitable works [we]re entirely consistent with a bank's business development plan.").

For similar reasons, Cordasco should not receive a light sentence on the ground that he has at times otherwise demonstrated strong character and integrity, or engaged in charitable work in the community, when not committing a felony to enrich himself.  (*See* Def. Sentencing Br. at 7-9).  Courts are rightly reluctant to give those who rose high in society, then abused their positions, too much credit for having impressed their friends and neighbors along the way.  As one court explained, "excellent character references are not out of the ordinary for an executive who commits white-collar crime; one would be surprised to see a person rise to an elevated position in business if people did not think highly of him or her."  *United States v. McClatchey,* 316 F.3d 1122, 1135 (10th Cir. 2003); *see also Repking*, 467 F.3d at 1095 ("[I]t is usual and ordinary, in the prosecution of similar white-collar crimes involving high-ranking corporate executives … to find that a defendant was involved as a leader in community charities, civic organizations, and church efforts."); *United States v. Morgan*, No. 13-6025, 2015 WL 6773933, at *22 (10th Cir. Nov. 6, 2015) (district court imposing sentence on senior public official erred in giving undue weight to letters of support. "One does not become President Pro Tem without the confidence of many supporters, some quite influential.").

Moreover, anyone who would describe Cordasco as "honest" and "trustworthy" (Def. Sentencing Br. at 7-8) has plainly seen only one side of his character.  Most obviously, Cordasco's crime in this case can in no way be described as reflecting a character for honesty or trustworthiness.  But even in less felonious matters, Cordasco seemed to view his position of power

as a means to self-indulgence.  Although not charged criminally, Cordasco's participation in the fire guard scheme—another example of his willingness to abuse his position of power in the FDNY—refutes any notion that he has at all times demonstrated the integrity and character for which his letters of support have lauded him, even leaving aside the instant offense.

Cordasco's medical issues likewise do not merit the leniency he seeks.  Cordasco claims that he should avoid serving any jail time whatsoever because the Bureau of Prisons does not regularly monitor inmates for the types of medical conditions from which Cordasco suffers, including heart and thyroid conditions.  (Def. Sentencing Br. at 5.)   It is of course wholly appropriate for the Court to take those conditions into account.  *See* 18 U.S.C. § 3553(a)(2)(D).  But the existence of those conditions did not prevent the defendant from committing a sustained and serious bribery scheme or from prospering economically from that scheme.  And as the Court is aware, the Bureau of Prisons is capable of addressing medical conditions, including, if need be, in a Federal Medical Center.

Cordasco's lack of a criminal history and the speediness of his guilty plea also do not support Cordasco's position.  As to Cordasco's lack of criminal history, the Guidelines accord with common sense by placing Cordasco in Criminal History Category I but do not give him any further credit as a first-time-offender because Cordasco played a leadership role in the instant criminal conspiracy.  As to the timing of his guilty plea, Cordasco's prompt acceptance of responsibility is laudatory but has already been factored into the Government's plea bargaining and sentencing recommendation and does not warrant any additional leniency.  As described above, prior to facing Indictment in this case, Cordasco sat in the knowledge that he was under FBI investigation for approximately six months after he was interviewed by (and repeatedly lied to) the FBI about his involvement in the scheme. What is more is that Cordasco's prompt

16

acceptance of responsibility came shortly after the unsealing of a 43-page speaking indictment that disclosed the fact of Santiago's cooperation with the Government and described in great detail the overwhelming evidence against Cordasco, which consisted in large part of text messages and emails in which he and his co-conspirators expressly planned and committed their bribery scheme. Under these circumstances, the 12- to 18-month downward variance recommended by the Government is more than sufficient to account for Cordasco's first-time offender status and speedy guilty plea.

**F.    The Need to Avoid Unwarranted Sentencing Disparities**

The need to avoid unwarranted disparities in sentences imposed on similarly situated defendants, 18 U.S.C. § 3553(a)(6), also supports a significant sentence and fine.  Cordasco's crime of conviction represents a direct abuse of the public's trust in him.  Courts should "hold our public officials to a higher standard" than civilian defendants. *Sampson*, 898 F.3d at 314. Cordsaco's conduct is thus appropriately compared with the sentences imposed on former public officials who abused their positions.  And such officials have received harsher sentences than the Government seeks here.  As one Court in this District explained when imposing an 84-month sentence on a state senator who paid bribes in an effort to obtain a nomination for New York City Mayor, in punishing such crimes: "the law takes into consideration the fact they they're public servants. That's what makes the crime so serious. It is that we are entitled to expect our public officials to only engage in selfless good deeds and to only legislate in the best interests of their constituents and to act in a way that is exemplary." *United States v. Smith*, No. 13 Cr. 297 (KMK), Dkt. 461 at 21-22 (S.D.N.Y. July 1, 2015).  Accordingly, imposition of a sentence of 42 to 48 months' imprisonment in this case would be commensurate with cases involving the breach of public trust.

## IV.    The 18 U.S.C. § 3572(a) Factors

This Court should also impose a fine of $250,000, at the top of the Guidelines range. Cordasco cannot dispute that he has the funds to pay such a fine, and the motive for his crimes was indisputably financial.  A significant financial penalty should thus be imposed.

The statutory factors to be considered before imposing a fine, in addition to the factors in Section 3553(a), include: (1) the defendant's income, earning capacity, and financial resources; (2) the burden that the fine will impose upon the defendant and any of his dependents; (3) any pecuniary loss inflicted upon others as a result of the offenses; (4) whether restitution is ordered; (5) the need to deprive the defendant of illegally obtained gains from the offenses; and (6) the expected costs to the Government of any imprisonment. 18 U.S.C. § 3572(a).

The Guidelines provide that district courts "shall impose a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine." U.S.S.G. § 5E1.2(a).  The pertinent factors are:

> (1) the need for the combined sentence to reflect the seriousness of the offense (including the harm or loss to the victim and the gain to the defendant), to promote respect for the law, to provide just punishment and to afford adequate deterrence;
> (2) any evidence presented as to the defendant's ability to pay the fine (including the ability to pay over a period of time) in light of his earning capacity and financial resources;
> (3) the burden that the fine places on the defendant and his dependents relative to alternative punishments;
> (4) any restitution or reparation that the defendant has made or is obligated to make;
> (5) any collateral consequences of conviction, including civil obligations arising from the defendant's conduct;
> (6) whether the defendant previously has been fined for a similar offense;
> (7) the expected costs to the government of any term of probation, or term of imprisonment and term of supervised release imposed; and
> (8) any other pertinent equitable considerations.

U.S.S.G. § 5E1.2(d).  The Guidelines further provide that, "[t]he amount of the fine should always be sufficient to ensure that the fine, taken together with other sanctions imposed, is punitive." *Id.* The defendant bears the burden of demonstrating an inability to pay a fine.  *See United States v.*

*Salameh*, 261 F.3d 271, 276 (2d Cir. 2001); *United States v. Camargo*, 393 F. App'x 796, 798 (2d Cir. 2010).

Many of the pertinent factors are already covered by the Section 3553(a) analysis above. With respect to the considerations unique here: Cordasco has significant income from an FDNY retirement pension and has considerable net worth. Although he has a negative monthly cash flow at this time, he has acknowledged that he has the ability to liquidate significant assets to pay a fine. (*Id.* ¶ 89.) Because of the nature of the offense, Cordasco is not required to pay restitution. (*Id.* ¶ 101.) If this Court imposes the term of imprisonment that the Government recommends and the Section 3553(a) factors urge, a fine of $250,000 will cover the cost of imprisoning Cordasco for his crimes, and will represent a material punishment that does more than simply disgorge his ill-gotten gains from him. (*Id.* ¶ 100.) Accordingly, a statutory maximum fine is warranted in this case.

## V.     Conclusion

For the reasons set forth above, this Court should impose a significant sentence of between 42 to 48 months' imprisonment and a statutory maximum fine of $250,000.

Respectfully submitted,

MATTHEW PODOLSKY
Acting United States Attorney for
the Southern District of New York
United States Attorney

By:     /s/ _____
        Jessica Greenwood
        Matthew King
        Daniel H. Wolf
        Assistant United States Attorneys
        (212) 637-1090 / 2384 / 2337

Cc:     Defense Counsel (by ECF)